## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CSI WORLDWIDE, LLC,             )
                                    )
                    *Plaintiff*,       )     No. 18 C 05900
    v.                         )
                                      )     Chief Judge Virginia M. Kendall
TRUMPF, INC.,                )
                                      )
                   *Defendant*.     )

## MEMORANDUM OPINION AND ORDER

Plaintiff CSI Worldwide, LLC provided labor services for Defendant, TRUMPF, Inc. at a 2017 trade show in Chicago. Having not been paid for any of these services, CSI filed this diversity action against TRUMPF, asserting several state law claims. (Dkt. 1). TRUMPF now moves for summary judgment. (Dkt. 127). For the following reasons, the TRUMPF's Motion for Summary Judgment [127] is granted in part and denied in part.

## BACKGROUND

The following facts are undisputed unless otherwise noted. TRUMPF and CSI have taken the tack of objecting to virtually every one of the other's Local Rule 56.1 statements. Many of these objections lack merit. To the extent a statement is inadequately supported, it is not credited in this Opinion. The few objections relevant to material facts on which the Court relies are resolved in footnotes.

This years-long dispute involves three main players. Defendant TRUMPF, Inc. ("TRUMPF") manufactures specialty machinery—primarily metal fabrication technologies like laser cutting systems—and routinely showcases its products at trade shows across the country. (Dkt. 1 ¶ 6). Third-party Lynch Exhibits ("Lynch") is a now-defunct entity that designed, engineered, and built trade show exhibits for clients like TRUMPF. (*Id.* ¶ 8). Plaintiff CSI

1

Worldwide, LLC ("CSI") specializes in installing, dismantling, and otherwise maintaining trade show exhibits. (*Id.* ¶ 5).

In the spring or early summer of 2017, TRUMPF issued a Request for Proposal ("RFP") inviting exhibit service providers to bid on a contract with TRUMPF for the November 2017 Fabtech trade show in Chicago. (Dkt. 128, Def. SOF ¶ 18). Lynch responded to the RFP and asked CSI if it would be interested in providing the labor for Fabtech if TRUMPF accepted Lynch's bid. (Def. SOF ¶¶ 19–20). CSI agreed to work with Lynch, but insisted on having a direct bill arrangement with the client based on its belief that Lynch was one of the "worst payors" in the business. (Def. SOF ¶¶ 44, 46). In June 2017, TRUMPF invited Lynch to a meeting at its Connecticut office to discuss Lynch's Fabtech proposal. (Def. SOF ¶ 22).[1] At this point, Lynch and CSI had come to an understanding that CSI would serve as the "labor partner" for Fabtech if Lynch ended up getting the job. (*See* Ex. 3, Dkt. 128-3 at 26:17 (Marasco Dep. Tr.)). CSI joined Lynch at the June 2017 meeting. Mark Marasco, Lynch's Director of Strategic Accounts, who was present, described the meeting as a "kickoff" where Lynch, CSI, and TRUMPF discussed TRUMPF's quality expectations for Fabtech. (Def. SOF ¶ 24; Ex. 21, Dkt. 135-2 at 9:3–4 (Marasco Dep. Tr.)). According to Marasco, five or six Lynch employees attended the meeting, along with at least one individual from CSI, Bill Joyce, the company's Vice President of Marketing. (Dkt. 135, Pl. SOF ¶ 1; Ex. 3, Dkt. 128-3 at 23:12–13). CSI's highest corporate officers, Tom McLaughlin (Principal) and David Centrowitz (CEO), did not attend. (Pl. SOF ¶ 4).[2] Various

---

[1] While TRUMPF claims that it is "undisputed" this meeting was a "beauty contest," where multiple bidders in addition to Lynch were invited to present their proposals for the Fabtech contract, the parties' statements of material facts and attached exhibits do not substantiate this characterization. (*See* Dkt. 129 at 5). Indeed, the words "beauty contest" do not appear in either party's Local Rule 56.1 statements. Instead, the evidence shows that each of the witnesses asked about the June 2017 meeting only testified to representatives from TRUMPF, Lynch, and CSI being present. (*See* Ex. 2, Dkt. 128-2 at 24:14–25:11 (Centrowitz Dep. Tr.); Ex. 3, Dkt. 128-3 at 21:24–24:4).

[2] CSI's repeated objections to TRUMPF's reliance on the testimony of CSI's highest corporate officers—Mclaughlin and Centrowitz—about what occurred during the June 2017 meeting are overruled. (*See, e.g.*, Dkt. 134 ¶¶ 25–28). First, CSI's hearsay objections are overruled because Centrowitz and McLaughlin's statements on which TRUMPF

TRUMPF employees, including Richard Buskey and Maren Fleming, were present. (Ex. 3, Dkt. 128-3 at 22:18–23:7).

The parties dispute exactly what was said and agreed to at the June 2017 meeting. According to CSI's version of events—as set forth in Bill Joyce's declaration—Buskey stated that TRUMPF would pay CSI's invoices directly. (Pl. SOF ¶ 2).[3] TRUMPF denies that there was any discussion of direct billing. (*See* Def. SOF ¶¶ 26–29). It relies on Centrowitz's deposition testimony. Despite not attending the meeting, Centrowitz stated that TRUMPF never specifically agreed to engage CSI as its labor service provider nor to pay them directly. (Ex. 2, Dkt. 128-2 at 41:25–42:6 (Centrowitz Dep. Tr.); Pl. SOF ¶ 4). Instead, he claims TRUMPF verbally committed to using CSI for Fabtech during the June 2017 meeting, but he did not elaborate further on the scope of that verbal commitment. (Ex. 2, Dkt. 128-2 at 42:6–16). TRUMPF also cites Marasco's testimony indicating that he did not recall any discussion at the June 2017 meeting about if or how TRUMPF would pay CSI. (Def. SOF ¶ 29; Ex. 3, Dkt. 128-3 at 24:5–10).[4]

TRUMPF and Lynch entered into a Trade Show Services Agreement, whereby Lynch agreed to supply marketing and trade show services to TRUMPF for a period of three years, ending on June 30, 2020. (Ex. 1, Dkt. 128-1 §§ 1.1, 2 (Trade Show Services Agreement)). These services

---

relies are statements by a party opponent, and therefore not hearsay under Fed. R. Evid. 801(d)(2); *Jordan v. Binns*, 712 F.3d 1123, 1128–29 (7th Cir. 2013). As CSI admissions, these statements need not be based on "first-hand knowledge of the incident." *Mister v. Ne. Ill. Commuter R.R. Corp.*, 571 F.3d 696, 698 (7th Cir. 2009).

[3] TRUMPF's objections to Bill Joyce's declaration on the basis that it is "self-serving" and "without factual support in the record" are overruled. (*See* Dkt. 136 at 5–6). The portions of Bill Joyce's declaration on which the Court cites and considers are supported by the record. First, TRUMPF does not dispute that Bill Joyce, CSI's then-Vice President of Marketing, attended the June 2017 meeting as CSI's representative. (Pl. SOF ¶ 1). And as discussed in later portions of this Opinion, Marasco corroborates several of Joyce's statements made in the runup to Fabtech. To the extent there is evidence in the record that contradicts Joyce's statements, that evidence does not eviscerate Joyce's credibility but merely highlights the genuine disputes of fact that surround many of the interactions about which Joyce testifies.

[4] CSI's objection to Marasco's testimony cited in Def. SOF ¶ 29 as lacking personal knowledge is overruled. It is undisputed that Marasco attended the June 2017 meeting at TRUMPF's headquarters. (*See* Pl. SOF ¶ 13). His testimony about that meeting reflects only his personal knowledge of what was discussed. He does not purport to know of all conversations that may have occurred between TRUMPF and CSI, as CSI suggests. (*See* Ex. 3, Dkt. 128-3 at 24:5–10).

3

included trade show coordination, fabrication, storage and transport, inspection and repair, project management, and consulting. (*Id.* §§ 2.1–2.6). The agreement permitted Lynch to engage third-party providers ("Partners") for various services. (*Id.* § 4.2). If Lynch contracted a Partner to fulfill one or more of its obligations to TRUMPF, Lynch remained "solely responsible for the performance of the Partner." (*Id.*) The Trade Show Agreement also set forth procedures for quotes and pricing. (*Id.* § 3.1). Lynch was required to provide a detailed quote for each project in accordance with the Agreement's Appendices. (*Id.*) The Appendices included detailed estimates for all Fabtech-related work, including specific line items for labor associated with the assembly and dismantling of TRUMPF's Fabtech exhibits. (*Id.* at App. 2 §§ 1.1.14, 1.2.14, 1.3.14). The Appendices did not, however, describe the allocation of work and payment among Lynch and its Partners, nor did they identify Partners by name. (Def. SOF ¶¶ 13–15).

On August 28, 2017, roughly one month after TRUMPF and Lynch signed the Trade Show Agreement, Marasco sent an email to Kim Jenkins, a CSI employee based in Chicago, and cc'd Centrowitz and Joyce. (Ex. 4, Dkt. 128-4 (08/28/17 Email)). The email confirmed that Lynch would be using CSI as its labor partner for TRUMPF's Fabtech exhibits. (*Id.*) Marasco further stated, "[a]s part of our contract with Trumpf – CSI will be invoicing Trumpf directly. I will have to confirm who the actual billing contact will be." (*Id.*) In the meantime, Marasco provided Maren Fleming's name and contact information for CSI's records. (*Id.*) Marasco's email did not include a copy of the Trade Show Agreement and, contrary to Marasco's statements, that document does not include any specific provision authorizing CSI to bill TRUMPF directly for its services. (Def. SOF ¶ 38; *see generally* Ex. 1, Dkt. 128-1). No one from TRUMPF was cc'd on the email. (*See* Ex. 4, Dkt. 128-4 at 1). And Marasco later testified that he never followed up with TRUMPF on whether CSI could bill the company directly and, if so, to whom it should send its invoices. (Def.

4

SOF ¶ 43). McLaughlin and Centrowitz both similarly acknowledged that CSI never sent any written confirmation to Fleming or TRUMPF regarding their understanding of the Fabtech billing arrangement. (Def. SOF ¶¶ 44–48). Instead, McLaughlin averred that he was under the impression Lynch "must have" told TRUMPF about CSI's internal requirement that they be able to bill TRUMPF directly. (Def. SOF ¶¶ 70–71; Ex. 5, Dkt. 128-5 at 34:13–23).

In the runup to the show, there was a meeting in Chicago between TRUMPF, Lynch, CSI, and Freeman—Fabtech's official contractor in charge of services like electrical, plumbing and anchoring. (Ex. 27, Dkt. 137-2 (Fabtech Official Vendors List); Ex. 21, Dkt. 135-2 at 25:20–26:24, 27:5–20). TRUMPF organized the meeting to get the relevant parties on the same page before exhibit installation began. (Ex. 21, Dkt. 135-2 at 26:3–12). Marasco attended the meeting for Lynch, and identified Fleming and Ryan Keefe as attendees for TRUMPF. (*Id.* at 26). Bill Joyce was present for CSI. (Ex. 24, Dkt. 135-5 ¶ 22 (Joyce Decl.)). Joyce claims that, during the meeting, he reiterated that CSI would "bill TRUMPF directly" for its Fabtech labor services, and that no TRUMPF employee objected to his statement to that effect. (Ex. 24, Dkt. 135-2 ¶ 25; Pl. SOF ¶ 15). TRUMPF denies Joyce made any such statement or, if he did, that any TRUMPF employee or representative heard it. (*See* Dkt. 137 ¶ 15). For Lynch's part, Marasco corroborates Joyce's telling. During his deposition, Marasco recalled Joyce responding to a comment that Freeman made during the meeting about Lynch's financial health with something along the lines of "it doesn't matter because we're being paid direct[ly] by the client." (Ex. 21, Dkt. 135-2 at 31:11–17). Marasco could not recall, however, whether anyone from TRUMPF contradicted Joyce, or whether Joyce and TRUMPF had any separate conversations about CSI billing TRUMPF directly. (*Id.* at 31:18–32:6).

After the Freeman meeting, CSI and Lynch got to work on building and installing TRUMPF's three Fabtech booths. During this phase of the project, Marasco acted as the "primary supervisor for Lynch," Keefe was TRUMPF's "project manager," and Joyce was the "city manager for CSI." (Ex. 21, Dkt. 135-2 at 24:24–25:8). The three men spent a significant amount of time together getting ready for the show, sometimes more than fourteen hours a day. (*Id.* at 25:4–6). Joyce estimates that, from September through November 2017, he met with Keefe approximately twenty times and Fleming approximately fifteen times to plan and implement the Fabtech trade show. (Pl. SOF ¶ 16; Ex. 24. Dkt. 135-5 ¶ 32). During these meetings, Joyce claims it was routinely discussed that CSI was not "Lynch labor" and would instead bill TRUMPF directly. (Ex. 24, Dkt. 135-5 ¶ 33). TRUMPF again denies that any of its representatives made any affirmative statements to Joyce regarding billing in the months leading up to the trade show. (Dkt. 137 ¶¶ 17–19).

Fabtech took place from November 6–9, 2017, and CSI completed all the installation and takedown for TRUMPF's exhibit booths. (Pl. SOF ¶ 20). On the first night of the show, a nitrogen explosion damaged one of TRUMPF's exhibits; CSI worked overnight to fix the booth and had it ready by morning. (Def. SOF ¶¶ 54–55). After the cleanup, Centrowitz mentioned to Fleming—somewhat "tongue in cheek"—that CSI's overtime was not part of the estimate. (*Id.* ¶ 56). Fleming reassured Centrowitz that TRUMPF would pay for the extra work and commended CSI for a job well done getting the exhibit ready for day two of Fabtech. (*Id.* ¶ 58). Separate from the nitrogen explosion, Joyce claims there were multiple points during the show when Fleming and Keefe authorized CSI's overtime work and assured him TRUMPF would cover the added costs. (Pl. SOF ¶ 22). Additionally, when Joyce requested a deposit during Fabtech to assist with growing expenses, Joyce claims Fleming and Keefe indicated they would request authorization for one from their supervisors. (*Id.* ¶¶ 23–26). No such deposit was paid and TRUMPF disputes Joyce's

6

narrative in its entirety, asserting any verbal statements made during Fabtech were invalid as contrary to the Trade Show Agreement between TRUMPF and Lynch. (*See* Dkt. 137 ¶¶ 23–26).

As it turns out, the Trade Show Services Agreement between TRUMPF and Lynch stipulated that Lynch would be paid for 95% of the "order sum" before Fabtech even began. (*See* Ex. 1, Dkt. 128-1 at 21). It is less clear what that "order sum" was. According to TRUMPF, the Trade Show Agreement provides the number, $2,202,724.81. (Def. SOF ¶ 59). But CSI rightly points out that the Agreement "contemplates the issuance of purchase orders by TRUMPF and provides for change order processing." (Dkt. 134 ¶ 59). Indeed, it seems the numbers included in the initial Trade Show Agreement—though redacted from the version offered in support of TRUMPF's summary judgment motion—are mere "estimates" or "quotes," and did not account for any actual work that had been completed. (*See* Ex. 2, Dkt. 128-2 at 33:20–35:11). Indeed, Marasco testified that CSI provided him with estimates that he included in his budget for TRUMPF and those numbers were built into the Trade Show Agreement. (Ex. 21, Dkt. 135-2 at 13:21–15:4). Marasco further testified that he routinely included partner estimates in his overall budgets, even in situations where it was clear the partner would be billing the client directly (*See* Ex. 3, Dkt. 128-3 at 54:5–57:4). Finally, Marasco testified that it was not uncommon in the industry for the final total to differ from the estimated total. (*See* Ex. 2, Dkt. 128-2 at 40:11–23).

In any event, Lynch was paid, at least for the most part, consistent with a total project cost of $2,202,724.81, as outlined in the Trade Show Agreement. For example, Lynch routinely invoiced TRUMPF for amounts proportionate to that total and received its first payment for 20% of that sum ($440,544.96) on August 3, 2017, shortly after it came to an agreement with TRUMPF and several weeks before CSI received notice it was being brought on as a labor partner. (*See* Exs. 7, 9, 11, 13, Dkt. 128-7, 9, 11, 13 (Lynch Invoices); Ex. 8, Dkt. 128-8 (ACH Payment Dated

08/03/2017)).[5] All told, by November 16, 2017, TRUMPF had paid Lynch $2,092,588.56. (Def. SOF ¶ 63). According to TRUMPF, this was the total amount due except for a $77,095.38 holdback, which TRUMPF paid in February 2018. (*Id.*; Ex. 15, Dkt. 128-15 (ACH Payment Dated 02/08/2018)). In the end, then, the total amount TRUMPF claims to have paid Lynch was $2,169,683.94, $33,040.86 less than the amount from the Trade Show Agreement.

CSI sent its labor invoices to Marasco for review shortly after Fabtech concluded. (Pl. SOF ¶ 32). On December 6, 2017, after Marasco approved the invoices, CSI sent them to Maren Fleming at TRUMPF. (*Id.* ¶ 33; Ex. 4, Dkt. 128-4 (CSI Email to Fleming)). Perhaps anticipating an impending payment dispute, CSI proactively stated that it "agreed with Lynch to provide our services to Trumpf based on CSI Worldwide billing Trumpf directly" and attached Marasco's August 28, 2017 email. (Ex. 4, Dkt. 128-4). Moreover, CSI shared its understanding that Lynch had been acquired by a separate exhibit house making it "even more critical that we bill Trumpf directly as per our agreement." (*Id.*) TRUMPF claims this December email was the first time it learned of Marasco's August communication with CSI and any promises that a direct billing relationship existed between TRUMPF and CSI—a claim CSI obviously disputes based on Bill Joyce's testimony. (Def. SOF ¶ 66). McLaughlin admits he had no communication with TRUMPF regarding billing for Fabtech before December 2017. (*Id.* ¶¶ 67–68). Indeed, CSI admits it had no

---

[5] CSI's objects to Lunch's invoices and TRUMPF's ACH records based on foundation and authentication. (Dkt. 134 ¶¶ 60–63). Ordinarily, the Court would sustain CSI's objection. "[D]ocuments submitted in support of a motion for summary judgment must be authenticated." *Smith v. City of Chicago*, 242 F.3d 737, 741 (7th Cir. 2001). While the invoices and ACH payments would likely be admissible at trial with an appropriate witness, TRUMPF did not submit any sworn affidavits from individuals who could speak to these documents' "trustworthiness and reliability." *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). Here, however, the invoices and ACH records are only relevant to CSI's unjust enrichment claim and the Court's determination that summary judgment be *denied* on that claim. As TRUMPF is the party who submitted the documents, it cannot "assert that they have not properly been authenticated." *Patriot Res. Partners II, LLC v. Serv. Disabled Veterans Bus. Assocs., Inc.*, 635 F. Supp. 2d 815, 820 (N.D. Ill. 2009); *see also Fenje v. Feld*, 301 F. Supp. 2d 781, 809 (N.D. Ill. 2003) ("Documents produced by an opponent during discovery may be treated as authentic."). Because the Court relies on these documents only to CSI's benefit, it has no reason to question their authenticity and admits them for this limited purpose.

written communication whatsoever with TRUMPF prior to December 2017. (Def. SOF ¶ 71). By the time CSI sent Fleming the invoices, TRUMPF had already disbursed over $2 million to Lynch for their Fabtech work.

Fleming eventually responded to CSI's emails with TRUMPF's position that Lynch was responsible for the invoices. (Def. SOF ¶ 73). She then raised the issue with Kevin Sweeney, Lynch's point person for pricing and billing, asking him why CSI was demanding that TRUMPF pay for services included in TRUMPF's original purchase order and contract with Lynch. (Ex. 28, Dkt. 137-4 (01/03/18 Email from Fleming to Kevin Sweeny)). While Sweeney's initial response made it seem like he, too, expected TRUMPF to pay CSI, he eventually told Fleming that it was Lynch's "position that TRUMPF is not responsible to CSI for those services rendered as your agreement for these services was with Lynch and not CSI." (*Id.*) He assured Fleming that Lynch was "working through the CSI obligation, and [would] have resolution in the near term." (*Id.*) There has been no such resolution.

In February 2018, after numerous attempts to collect from both Lynch and CSI, CSI filed an involuntary bankruptcy petition against Lynch in New Jersey seeking to recover the full outstanding amount for the Fabtech work. *See In re Lynch Exhibits, Inc.*, No. 18-12977 (Bankr. D.N.J.), Dkt. 1. The next month, Lynch filed a voluntary petition for bankruptcy and CSI filed a proof of claim for their Fabtech invoices. *See In re Dublin Mgmt. Assocs. of N.J., Inc. t/a Lynch Indus.*, No. 18-14501 (Bankr. D.N.J.), Dkts. 1, 164. Finally, on August 28, 2018, while the bankruptcy proceedings were ongoing, CSI filed this case to recover the same outstanding amount from TRUMPF. (Dkt. 1). Judge Norgle, who previously presided over this case, granted TRUMPF's Motion to Dismiss, (Dkt. 13), on the grounds that CSI was judicially estopped from recovering from TRUMPF given CSI's position in the bankruptcy proceedings that Lynch was

responsible for the debt. (Dkt. 32). The Seventh Circuit reversed, finding judicial estoppel did not apply and that CSI's claim against TRUMPF is not contrary to its claim against Lynch. *CSI Worldwide, LLC v. TRUMPF, Inc.*, 944 F.3d 661 (7th Cir. 2019) ("Seeking to recover one debt from multiple persons is common and proper."). After remand, the case was reassigned to this Court. TRUMPF now moves for summary judgment. (Dkt. 127).

To date, CSI has not yet received any payment from any party for $529,830.09 worth of its labor services for Fabtech 2017. (Dkt. 1 ¶¶ 14, 21).

## LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact "exists only if 'there is sufficient evidence' " for a reasonable jury to return a verdict for the nonmoving party. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)); *see Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. In evaluating a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in the nonmoving party's favor. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The Court's primary role in ruling on summary judgment is to determine whether there are any genuine issues for trial, not to "evaluate the weight of the evidence or to determine the truth of the matter." *See, e.g., U.S. Commodity Futures Trading Comm'n v. New World Holdings, LLC*, 2012 WL 983790, at *2 (N.D. Ill. Mar. 21, 2012) (quoting *Doe v. R.R Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994)).

## DISCUSSION

CSI alleges four causes of action in its complaint: (1) breach of contract based on Lynch's actions as TRUMPF's alleged agent; (2) promissory estoppel; (3) unjust enrichment; and (4) payment over notice of assignment. (Dkt. 1 at 4–9). Now, at summary judgment, CSI faces the "put up or shut up" moment. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). When faced with an adequately supported summary judgment motion, the nonmoving party can no longer "rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.' " *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoting Fed. R. Civ. P. 56(e)).

## I.    Choice of Law

As an initial matter, the Court must determine what law applies to this diversity action based entirely on state law. Federal courts sitting in diversity "appl[y] the choice-of-law rules of the forum state to determine which state's substantive law applies." *Auto–Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009). As TRUMPF rightly observes, however, no choice of law analysis is necessary when there are either no differences in the respective states' substantive law or when any differences will not affect the outcome of a given claim. *See Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905 (Ill. 2014); (Dkt. 129 at 2). Either Connecticut or Illinois law applies to this case; and the parties agree that there is no conflict between these two states' substantive law with respect to CSI's four claims. Thus, "[i]n the absence of a conflict, Illinois law applies as the law of the forum." *Universal Underwriters Ins. Co. v. LKQ Smart Parts, Inc.*, 963 N.E.2d 930, 945 (Ill. App. Ct. 2011).

## II.     Breach of Contract

The Court first considers whether it is possible that an enforceable agreement exists between CSI and TRUMPF. CSI does not allege, nor has it ever alleged, that it has an express contract with TRUMPF, brokered directly between the parties. Instead, CSI relies on agency theory in arguing that Lynch had apparent authority to enter into an agreement with CSI on TRUMPF's behalf, and that TRUMPF breached that agreement when it failed to pay CSI's Fabtech invoices. (*See* Dkt. 1 ¶¶ 22–28; Dkt. 133 at 11–12). If Lynch was, or reasonably appeared to be TRUMPF's agent, then Marasco's August 28, 2017 email promising CSI that it could bill TRUMPF directly might give rise to a breach of contract claim against TRUMPF. (Ex. 4, Dkt. 128-4). But TRUMPF argues that there are no facts in evidence or dispute that could lead a reasonable jury to believe that Lynch was TRUMPF's agent. (Dkt. 129 at 13–15). The Court agrees.

A principal is bound "not only by the authority that it actually gives to another, but also by the authority that it appears to give." *Petrovich v. Share Health Plan of Ill., Inc.*, 719 N.E.2d 756, 765 (Ill. 1999). An agent acts with apparent authority when the principal's words or actions create "the reasonable impression in a third party that the agent has the authority to perform a certain act on its own behalf." *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 577 N.E.2d 1344, 1350 (Ill. App. Ct. 1991). Under Illinois law, apparent authority exists when "(1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably and detrimentally relied on the agent's apparent authority." *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 673 (7th Cir. 2004). The principal's—not the alleged agent's—conduct guides the inquiry. *See Gondeck v. A Clear*

12

*Title & Escrow Exch., LLC*, 47 F. Supp. 3d 729, 740 (N.D. Ill. 2014). Moreover, third parties who believe themselves to be dealing with an authorized agent must "use reasonable diligence and prudence to ascertain whether the agent is acting and dealing with him within the scope of his powers." *Id.* (quoting *Gen. Refrigeration & Plumbing Co. v. Goodwill Indus. of St. Louis, Mo.*, 333 N.E.2d 607, 611 (Ill. App. Ct. 1975)).

In support of its agency theory, CSI first points to TRUMPF's conduct during the June 2017 meeting. According to CSI, TRUMPF employee Richard Buskey made several statements during that meeting to suggest that TRUMPF would pay CSI and other service providers directly, i.e., not through the primary contract awardee. (Dkt. 133 at 12). But CSI fails to explain how these statements have anything to do with Lynch's relationship to TRUMPF, much less how they could lead CSI to reasonably believe Lynch was TRUMPF's agent. The statements, taken as true, had everything to do with the proposed direct relationship TRUMPF would have with its trade show service providers. TRUMPF did not say that CSI's direct billing relationship would be built into the Lynch contract, or otherwise signal that Lynch would be the party to shore up the details on billing. Thus, Buskey's statements, assuming he made them, could not plausibly "instill[] in the third party a reasonable belief that the actor had authority to act as the principal's agent." *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 744 (N.D. Ill. 2014). That CSI observed TRUMPF employees "authorizing Freeman to provide services to TRUMPF" during the trade show, (Dkt. 133 at 12), similarly has nothing to do with Lynch, the alleged agent. In sum, the only TRUMPF conduct CSI points to involves TRUMPF working directly with service providers, not signaling that Lynch, or any other party, had the authority to manage those relationships.

Every other communication or action on which CSI relies comes directly from Lynch. This evidence alone, even when considered in the light most favorable to CSI, cannot support its

apparent authority theory. *See Linkepic Inc. v. Vyasil,* LLC, 370 F. Supp. 3d 906, 916 (N.D. Ill. 2019). Moreover, the undisputed facts show that CSI made no effort whatsoever to investigate whether Lynch in fact the authority had to act on TRUMPF's behalf. *See Malcak v. Westchester Park Dist.*, 754 F.2d 239, 245 (7th Cir. 1985) ("A third party dealing with an agent has the obligation to verify both the fact and extent of the agent's authority."); (Ex. 5, Dkt. 128-5 at 33:20–34:23 (McLaughlin testifying that TRUMPF "should have been aware" of a direct billing arrangement between CSI and TRUMPF because he assumed "[p]eople from Lynch must have told them.")) As TRUMPF notes, CSI could have "made its direct billing requirements, demands, or intentions clear to TRUMPF at any time." (Dkt. 129 at 14). Instead, CSI relied exclusively on Lynch's actions and communications and did not communicate with TRUMPF at all until the Fabtech work was complete and its invoices were due. This lack of diligence further undercuts CSI's agency theory.

Although the existence of an agency relationship is ordinar-ily a question of fact left to the jury, this is a case where "only one conclusion may be drawn from the undisputed facts." *Ioerger v. Halverson Constr. Co.*, 902 N.E.2d 645, 648 (Ill. 2008). No reasonable juror could conclude that Lynch had apparent authority to act as TRUMPF's agent. As a result, TRUMPF's Motion for Summary Judgment is granted with respect to CSI's breach of contract claim—Count IV of the Complaint. The lack of an express agreement between TRUMPF and CSI—or of an agreement between the two brokered by an agent—does not, however, foreclose all possible relief.

## III.    Quasi-Contract Theories

Counts I and III of CSI's Complaint, for promissory estoppel and unjust enrichment, fall in the broader category of "quasi-contract." *See, e.g.*, *Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 922 (N.D. Ill. 2016) (approaching promissory estoppel and unjust

enrichment as "quasi-contract" claims). Generally, quasi-contract remedies are unavailable when an express contract exists concerning the underlying subject matter. *See Premier Elec. Constr. Co. v. La Salle Nat'l Bank*, 477 N.E.2d 1249, 1257–58 (Ill. App. Ct. 1984). More specifically, a party "performing pursuant to a contract who is disappointed by its co-party's failure to pay generally cannot turn to a third party for compensation." *C. Szabo Contracting, Inc. v. Lorig Constr. Co.*, 19 N.E.3d 638, 645 (Ill. App. Ct. 2014); *see also Goldstick v. ICM Realty*, 788 F.2d 456, 467 (7th Cir. 1986) ("[I]f you do work pursuant to a contract with X, you don't expect that Y, a nonparty, will pay you if X defaults, merely because Y was benefited by your work[.]"). Generally, these principles limit subcontractors' ability to seek redress from owners, principals, or clients when they have express agreements only with a general contractor for payment of services.

The general limitation to the availability of quasi-contract remedies is subject to several important exceptions. For example, it is inapplicable to situations when the defendant not only benefits from the plaintiff's work but also enticed the plaintiff to "undertake the work in the first place and then refused to see [the plaintiff] paid." *Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp.*, 907 F.2d 732, 739 (7th Cir. 1990). And courts have upheld promissory estoppel liability against property owners who assure subcontractors they will be paid, despite not being in privity of contract with those subcontractors. *See, e.g.*, *Swansea Concrete Prods., Inc. v. Distler*, 467 N.E.2d 388, 392–93 (Ill. App. Ct. 1984). Either limitation could be said to apply to this case. Then, there is the added wrinkle that neither party claims there is a governing contract between Lynch and CSI, as would ordinarily be the case between a general contractor and subcontractor. And the Trade Show Agreement does not preclude CSI from recovering on its equitable claims because it was not a party to that agreement. *Compare RehabCare Grp. E., Inc. v. SAK Mgmt. Servs., LLC*, 2010 WL 3307084, at *2 (N.D. Ill. Aug. 18, 2010) (allowing promissory estoppel

action to proceed because a party in the case was not subject to the underlying contract governing the same transaction), *with Sharrow Grp. v. Zausa Dev. Corp.*, 2004 WL 2806193, at *3 (N.D. Ill. Dec. 6, 2004) ("Under Illinois law, promissory estoppel and unjust enrichment are unavailable where *the parties* have entered into an express contract." (emphasis added))*. Thus, this case is far removed from an ordinary dispute between a principal, general contractor, and subcontractor— despite TRUMPF's characterization of the relationship as such in a footnote. (*See* Dkt. 129 at 8 n.3). CSI can proceed with its promissory estoppel and unjust enrichment claims provided it has raised triable issues of fact as to those claims.

### A. Promissory Estoppel

Promissory estoppel is traditionally used as a tool to enforce promises for which "consideration is lacking, such as in cases involving gratuitous promises, charitable subscriptions, and certain intrafamily promises." *Doyle v. Holy Cross Hosp.*, 708 N.E.2d 1140, 1148 (Ill. 1999). "However, in recent years, courts have expanded the use of the doctrine to enforce promises underlying otherwise defective contracts and promises made during the course of preliminary negotiations." *Id.* CSI's claim falls in the latter category. To establish a promissory estoppel claim, a plaintiff must prove that "(1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 566 (7th Cir. 2012). TRUMPF contests only the first two elements, and primarily argues that the undisputed facts show TRUMPF never made a clear and unambiguous promise to pay CSI directly for their Fabtech labor. (Dkt. 129 at 3–7).

CSI claims that TRUMPF first assured CSI it could bill directly at the June 2017 meeting at TRUMPF's office in Connecticut. Bill Joyce, who attended that meeting, avers that Richard

Buskey affirmatively stated that TRUMPF would pay CSI directly because it "was a service provider and TRUMPF paid for services directly." (Pl. SOF ¶ 2). TRUMPF contests Joyce's account, and relies on McLaughlin's and Centrowitz's deposition testimony, wherein they both deny that direct billing ever came up during the June meeting. (Dkt. 129 at 4–5). But neither McLaughlin nor Centrowitz attended the June meeting. And although Marasco, too, denied a conversation surrounding direct billing ever arose during the June meeting, this competing testimony presents a quintessential factual dispute. A jury is best positioned to assess these various actors' accounts and make a finding as to what specifically was said or promised.

TRUMPF argues that no statement from the June 2017 meeting could possibly be construed as a clear and definite promise because that meeting was merely a "beauty contest" involving multiple exhibit houses and held long before any contract was finalized with Lynch. (Dkt. 129 at 5–6). Statements made during preliminary negotiations indicating a future business partnership often fail to satisfy the first element for a promissory estoppel claim. *See, e.g.*, *Tindall Corp. v. Mondalez, Int'l, Inc.*, 248 F. Supp. 3d 895, 910 (N.D. Ill. 2017) (comparing cases). But here, TRUMPF has failed to support its position that the June 2017 meeting was a "beauty contest." Instead, the parties' statements of fact and supporting evidence tend to establish the meeting was more of a "kickoff," involving TRUMPF, Lynch, and CSI alone. Thus, a reasonable juror may view statements made during the June meeting as evincing a present intent to do business, and ironing out the details surrounding the Fabtech show.

CSI also argues that TRUMPF's statements and actions in the runup to, and during the trade show amount to promises to pay for CSI's services directly. These examples would likely fall short of establishing a clear and unambiguous promise on their own, but coupled with the June 2017 statements, they strengthen CSI's argument as to both the existence of a promise and CSI's

17

justifiable reliance on the same. *See Falk v. U.H.H. Home Servs. Corp.*, 835 F. Supp. 1078, 1080 (N.D. Ill. 1993) (citing *First Nat'l Bank v. Sylvester*, 554 N.E.2d 1063, 1070 (Ill. App. Ct. 1990)) ("A promise may be inferred from conduct and words."). For example, CSI could interpret TRUMPF's silence in response to Joyce's statement at the September 2017 meeting that CSI was "being paid direct[ly] by the client," as a tacit endorsement based on the company's representations to that point, including during the June 2017 meeting. (Ex. 21, Dkt. 135-2 at 31:11–17). The same could be said of Fleming's and Keefe's alleged statements during the trade show about CSI's cleanup work following the nitrogen explosion and ballooning overtime costs in general. In other words, it would be reasonable to conclude from these facts that CSI believed all along that TRUMPF's promise to pay them directly was mutually agreed upon and served as the foundation for the two companies' relationship. Whether these are the interpretations that ought to be drawn is immaterial to the analysis at summary judgment.

Suffice to say, resolving all disputes of fact in favor of CSI, a reasonable juror could find that TRUMPF clearly and unequivocally promised CSI that it could bill directly, and that CSI's detrimental reliance on these promises was both expected and foreseeable. *See Swansea Concrete Prods., Inc. v. Distler*, 467 N.E.2d 388, 390–93 (Ill. App. Ct. 1984) (upholding finding of promissory estoppel under analogous circumstances, where principals made certain promises "concerning the method of payment" to subcontractors). Accordingly, TRUMPF's Motion for Summary Judgment on CSI's promissory estoppel claim is denied.

### B.  Unjust Enrichment

Next, TRUMPF moves for summary judgment on CSI's unjust enrichment claim. In Illinois, unjust enrichment is not a standalone cause of action, but a remedy that can flow from a contract implied in law. *Chicago Title Ins. Co. v. Teachers' Ret. Sys. of Ill.*, 7 N.E.3d 19, 24 (Ill.

App. Ct. 2014). A contract implied in law is one "in which no actual agreement between the parties occurred, but a duty is imposed to prevent injustice." *Hayes Mech., Inc. v. First Indus., L.P.*, 812 N.E.2d 419, 426 (Ill. App. Ct. 2004). To prevail on an unjust enrichment claim based on a contract implied in law, a plaintiff must establish that "valuable services or materials were furnished by the plaintiff, received by the defendant, under circumstances which would make it unjust for the defendant to retain the benefit without paying." *Id.* Of course, the mere fact that a defendant benefitted from the plaintiff's work is not enough; a plaintiff must demonstrate that the defendant's retention of the benefit "violates the fundamental principles of justice, equity, and good conscience." *Cleary v. Phillip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)).

According to TRUMPF, it cannot be held liable on a theory for unjust enrichment because it paid Lynch the total Fabtech contract price, which included CSI's labor costs. (Dkt. 129 at 8). TRUMPF's point here is an important one as unjust enrichment claims in third party or pseudo-subcontractor circumstances like this one depend in part on whether an award for the plaintiff would risk imposing double liability on the defendant. *See C. Szabo Contracting, Inc. v. Lorig Const. Co.*, 19 N.E.3d 638, 648 (Ill. App. Ct. 2014); *see also Hayes*, 812 N.E.2d at 426 (noting amount of damages in an unjust enrichment action depends on the "benefit received *and retained*" by the defendant (emphasis added)). Thus, courts routinely conclude there can be no unjust enrichment in situations where, for example, a "general contractor or an owner has paid someone for the benefit received." *C. Szabo*, 19 N.E.3d at 648. On the other hand, however, is the consideration that, if a principal, owner, or client "receives the very performance for which it contracted with another, then, absent some valid defense to payment, it would receive a windfall if allowed to retain the benefit while paying no one for it." *Id.* The key question is whether

TRUMPF *in fact* paid Lynch for the services CSI rendered. The answer to that question is maybe, rendering TRUMPF ineligible for a ruling on CSI's unjust enrichment claim as a matter of law.

TRUMPF argument rests entirely on the assumption that the Trade Show Agreement price of $2,202,724.81 captures the full amount of the services required for its Fabtech exhibits and, thus the complete value of the benefit it received from both Lynch and CSI. True, labor and service was a line item in the Trade Show Agreement; and it is undisputed that CSI completed that work. (Ex. 1, Dkt. 128-1 at App. 2 §§ 1.1.14, 1.2.14, 1.3.14). It is also true that the invoices TRUMPF submitted suggest most of the amounts "innocently paid . . . to Lynch" were proportionate to the dollar figure in the Trade Show Agreement. (Dkt. 136 at 14). But CSI has presented evidence that raise several material questions bearing directly on the total benefit TRUMPF received compared to the total amounts paid.

First, Lynch and TRUMPF arrived at the numbers in the Trade Show Agreement in July 2017, four months before Fabtech, and well before any of the work included in the Trade Show Agreement had been completed. The agreement itself classifies the information included in Appendix 2 as a "Detailed Pricing and Quote Specification," suggesting that the numbers were not necessarily final. (*See* Ex. 1, Dkt. 128-1 at App. 2). Further, Centrowitz and Marasco both testified that the numbers were estimates and that the actual invoices could vary based on "additional work that might be done," perhaps like overtime worked because of unforeseen nitrogen explosions. (Ex. 2, Dkt. 128-2 at 40:16–23). Indeed, TRUMPF's employees' statements during Fabtech buttress CSI's argument that TRUMPF knew all along the actual invoices it received from Fabtech would differ from the numbers included in the July quote. For example, Fleming assured Centrowitz that TRUMPF would cover the overtime costs associated with CSI's cleanup efforts. And Joyce claims that Fleming and Keefe made repeated assurances during Fabtech that TRUMPF

would cover their additional overtime. While TRUMPF disputes many of these facts, it is plausible to draw from them the conclusion that even if TRUMPF paid the full amount from the Trade Show Agreement, it still did not pay for all, or perhaps any, of CSI's Fabtech services and that it would be unjust to allow the company to retain the benefit derived therefrom.

Total price aside, Lynch's Fabtech invoices could well establish that TRUMPF paid for CSI's services in full. But those invoices are both unauthenticated and devoid of any useful information. Each one is labeled generally as a "progress invoices" for percentages of the "referenced purchase order and Trade Show Services Agreement in the Amount of $2,202,724.81." (*See* Exs. 7, 9, 11, 13, Dkt. 128-7, 9, 11, 13). No invoice or payment disbursement specifies that any amount was paid for labor services generally, or CSI's work particularly. Finally, TRUMPF did not even pay Lynch the full $2,202,724.81. Instead, the sum of TRUMPF's payment confirmations is $2,169,683.94. TRUMPF does not explain the discrepancy between the two figures. Even if small in relation to the total payment, that discrepancy casts doubt on TRUMPF's position that the Trade Show Agreement provided the full amount due for Fabtech, no more, no less.

In summary, genuine disputes of material fact remain as to the possibility that TRUMPF "received a benefit" from CSI's labor, "but has paid no one for it." *C. Szabo*, 19 N.E.3d at 647; *see also Sunny Handicraft (H.K.) Ltd. v. Envision This!, LLC*, 2019 WL 4735459, at *12 (N.D. Ill. Sept. 27, 2019) (noting an unjust enrichment claim can be sustained by showing a party "agreed to pay for the [services], and has not fully done so"). Thus, summary judgment is inappropriate as to CSI's unjust enrichment claim.

## IV.     Payment over Notice of Assignment

Finally, TRUMPF moves for summary judgment on CSI's claim for "Payment Over Notice of Assignment," Count II of the Complaint. (Dkt. 1 ¶¶ 22–40). TRUMPF argues that CSI has failed to provide any evidence that an assignment exists and, even if it could, has failed to show that TRUMPF received notice of that assignment. (Dkt. 129 at 9–12). The Court agrees that the undisputed facts do not establish a valid and enforceable assignment.

An assignment is merely a "contract between the assignor and the assignee." *Amalgamated Transit Worker's Union v. Pace Suburban Bus Div. of Reg'l Transp. Auth.*, 943 N.E.2d 36, 41 (Ill. App. Ct. 2011) (citation omitted). An assignment need not take a particular form, but must "sufficiently evidence[] the intent of the assignor to vest ownership of the subject matter of the assignment in the assignee." *Cincinnati Ins. Co. v. Am. Hardware Mfrs. Ass'n*, 898 N.E.2d 216, 230 (Ill. App. Ct. 2008) (quoting *Brandon Apparel Grp. v. Kirkland & Ellis*, 887 N.E.2d 748, 756 (Ill. App. Ct. 2008)). Moreover, the assignment must "describe the subject matter of the assignment with sufficient particularity to render it capable of identification." *Id.* (quoting *Klehm v. Grecian Chalet, Ltd.*, 518 N.E.2d 187, 191 (Ill. App. Ct. 1987)).

The purported assignment here is Marasco's August 28, 2017 email. In that email, Marasco states that CSI will "be invoicing TRUMPF directly" as part of Lynch's contract with TRUMPF. (Ex. 4, Dkt. 128-4). This language is clear, and it does not manifest any intent on Lynch's part to assign away rights it may have possessed under the Trade Show Agreement. Nor does it describe with any particularity what CSI now claims was assigned via the communication. Instead, Marasco's email manifests a mistaken belief that Lynch and CSI seem to have shared about how CSI would be paid. Indeed, Marasco testified that it was his understanding "throughout th[e] project and right up through and including the Fabtech show" that CSI would be billing TRUMPF

22

directly. (*See* Ex. 21, Dkt. 135-2 at 41:18–44:15). If Marasco never believed Lynch had the contractual right to receive payment for CSI's services, then he could not have intended to assign away those rights in his August 28, 2017 email to CSI. CSI cannot manufacture a claim that Lynch assigned its rights under the Trade Show Agreement when the underlying facts demonstrate not a bargained-for assignment, but rather botched business negotiations and breakdowns of communication. Because no reasonable jury could find that a valid assignment exists based on the undisputed facts in this case, TRUMPF's Motion for Summary Judgment is granted as to Count II.

## **CONCLUSION**

For the reasons set forth above, TRUMPF's Motion for Summary Judgment [127] is granted in part and denied in part. Judgment is entered in TRUMPF's favor as to Counts II and IV of CSI's Complaint—for breach of contract and payment over notice of assignment. Summary judgment is denied as to Counts I and III of CSI's Complaint, for promissory estoppel and unjust enrichment, and those claims can proceed to trial.

Virginia M. Kendall
United States District Judge

Date: September 2, 2025